

HOWARD ALAN ZOCHLINSKI
101 Luz Pl.
Davis, California, 95616
Tel: 530-758-1474
IN PRO PER

FILED

JUN 17 2015

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
                    DEPUTY CLERK

SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF YOLO

HOWARD ALAN ZOCHLINSKI,

    Plaintiff

        vs.

JOHN OAKLEY, JOHN WARREN JONES, AND UNKNOWN INDIVIDUALS. HEREBY DESIGNATED AS DOES 1-100

Defendants in both their official and individual capacity

Case No.: CV-2:10-cv-01824 JAM-KJM

AMENDED COMPLAINT FOR: SLANDER & DEFAMATION OF CHARACTER; INTENTIONAL INFLICTION OF MENTAL SUFFERING AND EMOTIONAL DISTRESS; INTERFERENCE WITH RIGHT TO PRACTICE PROFESSION AND PURSUE CAREER & EMPLOYMENT THROUGH STIGMATIZATION; VIOLATION OF THE RIGHT TO PRIVACY, VIOLATIONS OF THE FIRST AND 14TH AMENDMENTS TO THE CONSTITUTION AND CIVIL RIGHTS VIOLATIONS UNDER FEDERAL AND STATE LAWS INCLUDING, BUT NOT LIMITED TO, 42 USC §§ 1981, 1982, 1983, 1985, 1986, 2000a-2000e, AND CALIFORNIA STATE LAWS OF A SIMILAR NATURE AND INTENT [CIVIL CODE §§ 51-55], AND CONSPIRACY TO DO ALL OF THE ABOVE. PLAINTIFF ASKS FOR EXEMPLARY AND PUNITIVE DAMAGES.

Date: _____, 2015
Time:     9:00 a.m.
Department:

0

**Plaintiff, Howard A. Zochlinski, alleges:**

1.      Defendant John Oakley (hereafter Oakley), is and at all times herein mentioned was a resident of Yolo County, California, employed by the Regents of the University of California as a professor of criminal law at the U.C. Davis School of Law, a.k.a. King Hall (hereafter King Hall). During the times herein he also served, temporarily, as the Chair of the Academic Senate of the UC Davis Campus (hereafter Senate) and Chair of the UC systemwide Academic Council (hereafter Council).

2.      John Warren Jones (hereafter Jones), is and at all times herein mentioned was a resident of Yolo County, California, employed by the Regents of the University of California as a police officer on the UC Davis campus. To Zochlinski's knowledge, Jones arrived in Davis the same year as Zochlinski – 1984. Prior to that, Jones had been a UCPD detective at UCSB. Sometime after 1972, Jones had been demoted from detective to officer, possibly due to his failure to secure a conviction of Zochlinski and the resulting lawsuit. Zochlinski, in his research, has found that Jones, in 1987, was involved in a racial incident that led to an Asian or Asian-American student being in a coma – Jones had refused to intervene during an attack on the student by a skin-head gang shouting racial epithets. As a result, Jones was fired from the UCPD. In Court documents filed in Jones efforts after his firing, his superiors described him as a "liar", a "slacker", "deadwood" and implied that he was a coward and a bully. Jones was rehired in 1992 due to a technicality in his firing – a *Skelly* violation – in that the wrong UC official signed the documents firing him (These facts are presented in the Yolo County Superior Court civil case # 92-70396). Shortly thereafter he discovered Zochlinski was a student on the UC Davis campus and was about to get his Ph.D. Jones suit against the University for recovery of lost salary (Yolo County Superior Court # 92-70396) was still in the Court system at that time. Zochlinski was informed only recently (May 2015), in the form of a death certificate filed in another case by opposing counsel, that Jones died in 2011.  However, because Plaintiff includes allegations against defendant Jones as the effects of his actions continue to cause harm to the Plaintiff and recovery is possible against Jones' estate.

3.      Zochlinski is ignorant of the true names and capacities of defendants sued herein as DOES 1-100, inclusive, and therefore sues these defendants by such fictitious names. Zochlinski will amend this

1

1   complaint to allege their true names and capacities when ascertained. [Zochlinski is informed and

2   believes and alleges that each of the fictitiously named defendants is responsible in some manner for

3   the occurrences herein alleged, and / or repeating the slanders described with the intent of harming

4   Plaintiff, preventing employment in his profession or any other employment and preventing completion

5   of his education (i.e: securing award of a Ph.D. at any University in the United States)   and that

6   Plaintiff's damages as herein alleged were proximately caused by their conduct].

7   4.      Zochlinski is informed and believes that members of the Board of Regents are among the Does

8   mentioned immediately *supra*, and, further, is informed and does believe that the Board of Regents and

9   each individual member is aware of and does support the "policy, custom and practice" within the UC

10  system of deliberately mishandling all charges involving crimes against women and of  retaliation for

11  whistleblowing or threatening to whistleblow on civil and criminal violations within the UC system by

12  administrators, police and faculty if said civil or criminal violations would enrich the UC system

13  financially or in terms of reputation.

14  5.      Defendants Oakley, Jones and Does 1-100 at all times herein mentioned were the agents and

15  employees of the Regents of the University of California, who are believed to be included among the

16  Does, and in doing the things hereinafter alleged were acting for the benefit of the Regents of the

17  University of California by carrying out the Regents "policy, custom and practice" of retaliation, acting

18  within the scope of their employment, with the tacit consent and / or permission of the Regents.

19  Defendants Oakley and Jones. By their actions in deliberately and knowingly harming Zochlinski,

20  intended to also secure their own personal advantage and advancement with the UC system.

21  6.      Beyond career advancement, Oakley and Jones are motivated by racial animus, personal bias

22  and, for Defendant Jones, personal retaliation for a long-standing vendetta based in racial animus,

23  career harm and political animosity.

24  7.      Defendants Oakley, Jones, and Does [inclusive of all Does, including members of the Board of

25  Regents found to be involved] are sued in both their official and individual capacities.

26  8.      At all times mentioned herein, Plaintiff Zochlinski (hereafter Zochlinski or Plaintiff) was, and

27  now is, a resident of the City of Davis, County of Yolo, State of California. Zochlinski has resided in

the City of Davis for 31 years. For the past 23 years he has been involved in legal efforts to clear his name and restore his reputation, secure employment in his field, resume his career and return to the University of California or another University to complete his education, having been disqualified at UC Davis in 1993. His disqualification was done despite his having completed all his assigned laboratory research work, having passed his Qualifying Exams, having co-authored three research papers in AIDS vaccine development that were published in prestigious, peer-reviewed journals, and having been advanced to candidacy for his Ph.D. The cause of his disqualification was his threatening to whistleblow on Defendant Jones 1972 interactions with Zochlinski, inclusive of Jones three arrests of Zochlinski on false and malicious charges, Jones failed efforts to entrap Zochlinski on other charges, and Jones participation in the gang rape of Zochlinski in the Santa Barbara County Jail in 1972.

9.      On January 24, 2009, Plaintiff Zochlinski was informed of slanders made by Oakley and Jones against his person. This information was provided by Prof. Peter Rodman in a declaration made in another legal case [attached as Exhibit A].

10.     In Spring of 2000 Zochlinski had approached Prof. Rodman, professor of anthropology, former Associate Dean of Graduate Studies, to request his aide in Zochlinski's efforts to return to the University of California and secure award of his already earned (based on prior completion of his work) Ph.D. in Molecular Biology. Zochlinski had known Prof. Rodman during his time as a student and had been reluctant to approach him prior to that time as Prof. Rodman was not in his field and had never been one of Zochlinski's mentors. However, as Zochlinski's had gotten only resistance within the UC Davis administration; he was desperate and had hoped Prof. Rodman, whose stance while an administrator was pro-faculty and pro-student, might aid him once aware and informed of the problem.

11.     At that time Zochlinski explained to Prof. Rodman the circumstances of his disqualification from the UCD Genetics graduate program: that he had been arrested in 1992 on false and malicious charges by a UC police officer, John Warren Jones; that this officer was vicious anti-Semite; that this officer had arrested Zochlinski in 1972 on false and malicious charges at UC Santa Barbara; that this officer had arranged the beating and brutal gang rape of Zochlinski at the Santa Barbara County Jail while he had been awaiting trial in 1972 and that both the 1972 and the 1992 arrests were motivated by

racial animus [Jones had called Zochlinski "Jewboy" among other slurs in 1972 and 1992] and the 1992 arrest was in retaliation for Jones having failed to secure a conviction in 1972, having been sued for the 1972 arrests and suffering career problems as a result of his failure in 1972 and the resulting lawsuits. The Court should note the 1992 arrest also failed – charges were dismissed.

12.     Prof. Rodman found Zochlinski's story unusual and difficult to believe, and decided to investigate before committing to aid. Zochlinski. As part of this investigation, Prof. Rodman contacted Oakley, whom he had known for nearly 30 years at that time. Both had been students at Harvard.

13.     Oakley, during his career, had defended a convicted criminal on "death row" at the Vacaville State Prison, and Prof. Rodman as well as others, including colleagues at King Hall and other faculty at UC Davis, considered Oakley an expert on matters regarding criminal psychology and guilt / innocence. The following is a quote from Prof. Rodman's declaration [Exhibit A] that had been submitted in case PT-07-009; it contains the slander that is the subject of this suit:

> "I [Rodman] thought he [Oakley] would have a good sense for the merits of standing up for a man who is possibly falsely accused. I also felt he would have some sense of the credibility of Mr. Zochlinski's alleged history and could advise me on whether to pursue supporting him or not. When I gave him Mr. Zochlinski's name, without even discussing the case, Mr. Oakley told me that Mr. Zochlinski had come to his office many years before to ask for his advice and assistance in his case against the University. He continued to advise me not to become involved with Mr. Zochlinski. In his words, I could be '…putting myself and my family in danger…' by doing so. He went on to equate his impression of Mr. Zochlinski with his impression of Charles Manson, the convicted psychopath housed at the Vacaville prison where his death row client is housed."

14.     Prof. Rodman went on to say in the following paragraph:

> "I have no doubt Mr. Oakley was sincerely concerned for my safety and thought he was giving me a reasonable admonition. His was the most extreme version of this reaction to Mr. Zochlinski, and he was the most extremely wrong in his description. It is chilling to think that first impressions that are so wrong and so irrational like those of Ms. Wilson and Professor Oakley could have affected Mr. Zochlinski's life so consistently."

15.     After reading the declaration submitted by Prof. Rodman, Zochlinski spoke with Prof. Rodman. Zochlinski stated that he could not remember ever meeting with Oakley, only meeting with Prof. Brownstein (professor of constitutional law); Prof. Millard Murphy and law student Seth Marewitz, former President of the Jewish Law Students Association of King Hall. Plaintiff stated to Prof. Rodman

at that time that a meeting could have occurred and that he would check his records; however, nothing he [Plaintiff] had ever said to anyone during the entire time his problems with the University had been ongoing could have given the impression that Oakley had conveyed to Prof. Rodman.

16.    Plaintiff has since checked extensively through his records and found no reference of any sort to Oakley until 2005, long after the alleged meeting with him had taken place, and after the meeting with Prof. Rodman at which he was asked about Zochlinski had occurred – in 2000. The 2005 reference was a letter referencing the vote of the UC Davis Academic Senate in favor of Zochlinski's reinstatement, and was not for a meeting. Zochlinski has never had a meeting with Oakley to discuss his problems with the University nor for any other purpose.

17.    Oakley's statements about Plaintiff were heard by Prof. Rodman and other persons unknown to Zochlinski. Zochlinski is informed and believes that Oakley made similar statements to, among others, members of both the Senate and the Council (see *infra* for details and how this gives rise to a cause of action), members of the UC Davis administration, including but not limited to Dean of Graduate Studies Jeffrey Gibeling, and to a former student of King Hall, Seth Marewitz. Oakley's slanderous statements were used to influence other individuals to deny support and aid to Plaintiff and, instead, to act to harm his interests and prevent his return to the University of California as a student and / or employee or employment elsewhere. Several of the details of how this occurred are found *infra*.

18.    As part of his investigation, Prof. Rodman spoke with Teresa Lee, a UC Davis student of veterinary medicine who also was a journalist on the *California Aggie*, UC Davis' campus newspaper.

19.    In the winter of 2000-2001 Ms. Lee began investigating Plaintiff's situation with the University of California for an article to be published in the UC Davis campus paper.

20.    The following quote is from the declaration of Prof. Rodman:

"According to Ms. Lee, the editor (of the California Aggie) was intimidated by Jones's description of Mr. Zochlinski as a dangerous man and decided not to run the story."

21.    Jones also had claimed, falsely, that Zochlinski had been convicted of charges made against him in 1972, thus imputing Zochlinski had been convicted of serious charges, including felonies, in the past when no such convictions had occurred.

**SLANDER, DEFAMATION (UNDER CALIFORNIA STATE LAW)**

22.    **Oakley**: The statements attributed to John Oakley are slanderous *per se* because they impute to Zochlinski a mental disease that would cause him to be shunned and avoided; held up to public ridicule, and be adjudged unfit for returning to the University as a student and/or unfit for employment in his profession, or any employment dealing with the public. This is particularly the case as Plaintiff's profession could include his working with instruments of mass destruction – biological agents. As a student, Zochlinski had worked on the AIDS Vaccine Development project, and had access to HIV and other viruses.

23.    The statements attributed to Oakley are also slanderous *per se* in the context given – a discussion of Plaintiff's criminal arrest record and alleged mental state by an acknowledged expert in the matter, as they clearly conveyed the idea that, despite not having ever been convicted as a result of any of the five arrests by UC police [three in 1972, one in 1992, one in 1993 – all charges were false and malicious, four arrests were made personally by Jones], Plaintiff was a dangerous, mentally unstable and deranged criminal who was some sort of mastermind that had merely avoided conviction. At the very least, the words spoken were clearly understood to carry the defamatory meaning that Plaintiff was a dangerous individual, a deadly threat to any individual and that individual's family, should said individual befriend or aid Zochlinski, and that not only should Zochlinski not be aided but he should be shunned and avoided.

24.    The words uttered by Oakley were and are false statements because:

a.    Zochlinski never had a meeting with Oakley;

b.    Zochlinski has never been diagnosed as a sociopath, psychopath, or in any other similar category of mental illness; nor has he ever been adjudged as "dangerous" by any act he has actually committed at the time or any statement he had made. Only individuals employed by the University of California and, as employees of the UC Regents, were following their "policy, customs and practices" and who, thus, wished to harm the Zochlinski in order to benefit the Regents and advance their own career within the UC system or who had been misled by statements by these individuals, had ever described Zochlinski in such terms or considered Zochlinski as "dangerous", etc.

25.   **Jones:** The words attributed to John Warren Jones, carried a defamatory meaning and are slanderous *per se* as they conveyed to the editor of the newspaper that Plaintiff was a danger to the community, a convicted felon, and should not be listened to, believed or aided. Jones position as a police officer gave his words added meaning and impact. As a result of his slanders, the editor refused to run the article on Zochlinski written by Ms. Lee.

26.   The words uttered by John Warren Jones were and are false statements because Plaintiff is not dangerous, never has been diagnosed as dangerous by any medical practitioner, nor has any evidence gathered by Jones or the UCPD ever proven Zochlinski "dangerous" and, in the criminal complaint taken by Jones in 1992, it was clearly stated that Zochlinski had never even made threats toward his alleged victim nor assaulted her. Furthermore, none of the charges for which the University of California police had arrested Zochlinski, in 1972 and in 1992 and 1993, ever led to a conviction. Jones never had any grounds to believe Zochlinski to be suspect in any crime, nor to be in any way dangerous, other those which Jones manufactured in his own anti-Semitic delusions and racial hatred.

27.   As a result of the above described actions / words of both defendants, Oakley and Jones, Plaintiff has suffered general damages to his reputation; career ending stigmatization; and interference with his First Amendment rights (see *infra*), among other harms.

28.   As a further proximate result of the above described statements attributed to Oakley and Jones, Plaintiff has been stigmatized and has suffered the following special damages:

a.   Rumor campaigns about Zochlinski were propagated, leading people to misjudge him and shun him. This has particularly affected his relationships with women with whom Zochlinski would otherwise enjoy companionship and other relationships, including marriage and children.

b.   Zochlinski has been unable to secure legal representation [i.e. an attorney].

c.   Zochlinski has been unable to secure employment.

d.   Various faculty have refused to aid Zochlinski in his efforts to return to academia and have, in fact, shunned him, refusing to meet or speak with him.

e.   Zochlinski has been unable to secure admission to another university to complete his education.

7

f.     As a direct result of Jones words, the article on Zochlinski was not published in the California Aggie newspaper; the campus newspaper and outlet most likely to get him support within the campus community.

29.     The above-described statements by Defendants were spoken with malice and / or oppression and fraud in that:

a.     Oakley had never had contact with Zochlinski, and Oakley is not a medical practitioner able to diagnose any psychological illness. His statements were given a patina of legitimacy by Oakley's professional status as a criminal attorney, his position within the UC system's hierarchy (see *infra*), his familiarity with the Manson case and other cases of psychopathic criminals, and his personal closeness to Prof. Rodman. Oakley deliberately and with malice intended to harm and damage Zochlinski and prevent Zochlinski from achieving his goal of returning to the UC Davis or any other University. Plaintiff is informed and believes that Oakley is motivated by racial animus and / or personal bias; and further motivated by Oakley's intent, as Zochlinski has been informed and believes, to become a chancellor within the UC system and that preventing Plaintiff from succeeding in his goals aides Oakley in his career objective as it enforces the Regents policy of retaliation.

b.     Jones was fully aware that Plaintiff is not a dangerous individual and had not been convicted of the crimes he had arrested him for in 1972 as he had ordered Zochlinski's full arrest and conviction record at the time of his seeking a warrant in 1992, yet deliberately and with malice portrayed him as dangerous and a convicted criminal in order to prevent publication of an article in a UC campus newspaper that would embarrass both Jones and his employer, the Regents of the University of California. Jones use of racial slurs / invective is proof of his racial animus toward Plaintiff. Jones, at that time, had just been rehired and was still been involved in a legal dispute with the Regents over his backpay from his firing in regards to the 1987 racist incident (¶2, *supra*) and by enforcing the Regents policy of retaliation, had intended to get back in the good graces of his employer.

30.     The acts / statements of Defendants alleged above were willful, wanton, malicious and oppressive, and justify the awarding of exemplary and punitive damages.

1   **MENTAL SUFFERING AND EMOTIONAL DISTRESS (UNDER CALIFORNIA STATE**

2   **LAW)**

3   31.    The above-described statements by Defendants Jones and Oakley constitute intentional,

4   deliberate and malicious conduct as defendants, at all times, knew their statements to be false. These

5   actions were done for the purposes of causing Zochlinski to suffer shunning, humiliation, mental

6   anguish and emotional and physical distress. As a result, Zochlinski has been injured in mind and body,

7   including a worsening of his clinical depression, insomnia, anxiety, loss of female companionship, loss

8   of friendships, shunning, increased need for medication, several emergency room visits and surgery.

9   32.    All Defendants' [including actions by unknown Does] actions / statements were done with the

10   knowledge and intent that Plaintiff's emotional and physical distress would thereby increase, and were

11   done deliberately, with a wanton and reckless disregard of the truth and of consequences to Zochlinski.

12   33.    As the proximate result of the acts / statements of Defendants as alleged above, Zochlinski

13   suffered humiliation, mental anguish, and emotional and physical distress, loss of female

14   companionship, loss of friendships, and has been injured in mind and body, with clinical depression and

15   various physical ailments including diverticulitis that resulted in surgery and extended hospital stays.

16   34.    By reason of the acts / statements of Defendants, Plaintiff was prevented from attending to his

17   usual occupation, completing his education, enjoying his life, enjoying female companionship and has

18   suffered premature mental and physical degeneration that will shorten his lifespan, increase the

19   likelihood of dementia, and deprive him of children.

20   35.    The acts / statements of Defendants alleged above were deliberate, willful, wanton, malicious

21   and oppressive, and justify the awarding of exemplary and punitive damages.

22   **CIVIL RIGHTS VIOLATIONS UNDER THE US AND CALIFORNIA CONSTITUTIONS**

23   **AND FEDERAL AND STATE LAWS [including 42 USC §§1981 & 1983 (Federal) and the**

24   **Unruh, Ralph and Tom Banes Civil Rights Acts (California)]**

25   36.    Defendants Oakley, Jones and Does are, and at all times mentioned in this complaint were,

26   acting under the color of state law.

9

37.   Defendants Oakley, Jones and Does are, and at all times mentioned in this complaint were, employed by the Regents of the University of California.

38.   Defendant Jones was, at all times mentioned in this complaint, acting in the course and scope of his employment and in his capacity as a police officer of the University of California.

39.   Defendant Oakley was, at all times mentioned in this complaint, acting in the course and scope of his employment by the Regents of the University of California and represented his actions as within his expertise as an attorney, knowledgeable of criminal conduct and psychology.

40.   Defendant Does were, at all times mentioned in this complaint, acting in the course and scope of their employment by the Regents of the University of California.

41.   The actions of in Defendants Oakley, Jones and Does served to retaliate against Plaintiff for his past complaints of anti-Semitism, civil rights violations and other civil and criminal violations and improprieties within the UC system and enforce the Regents policy of retaliation for such complaints. All Defendants expected to advance their own careers within the UC system by harming Zochlinski in his education and career and interfering with his efforts to exercise his constitutionally guaranteed rights.

**ACTIONS BY DEFENDANT OAKLEY IN VIOLATION OF ZOCHLINSKI'S CIVIL RIGHTS**

42.   Defendant Oakley, acting as described above, interfered with Plaintiff's First Amendment Rights in several ways:

43.   The first of these violations is preventing Zochlinski's reinstatement (an admissions issue) to the University of California, Davis. The US Supreme Court has declared that Academic Freedom is a "special concern" of the First Amendment, the High Court specifying university admissions, particularly to a graduate or professional school, as one of the most important aspects of this "special concern" and a right under the First Amendment. This has been interpreted in several districts to be a right treated with respect to due process and equal treatment under the law; and as a property interest as an advanced degree is considered a valuable property and as a liberty interest as it also opens up various opportunities to its holder – e.g. membership in professional organizations and the right to apply for research funding. This aspect gives this case unique and novel standing.

44.    Defendant Oakley violated Plaintiff's rights to redress of grievances within the UC system and the Courts of the State and Federal governments.

45.    Defendant Oakley acted to deprive Plaintiff of both due process and equal treatment under the law, in violation of the 14th Amendment.

**Oakley's Actions beyond those enumerated *supra*:**

45.    Note: As Zochlinski had never met with Oakley, there are questions as to where and from whom he came to be informed of Zochlinski and Zochlinski situation vis-à-vis the administration at UC Davis and the Regents. Any statements as to sources would constitute speculation and would be inappropriate at this time. However, should individuals names arise through discovery, Zochlinski reserves the right to add them under the heading of Does in the future.

46.    Zochlinski is informed and believes Oakley, in June 2006, acted through fraud and oppression to secure passage of University-wide Committee on Rules & Jurisdiction (hereafter UCR&J) Legislative Ruling 6.06 (hereafter 6.06):

> **"6.06**: Consistency of the Academic Senate Regulation 904 with the Code of the Academic Senate: UCR&J maintains that Senate Regulation 904 is consistent with the Code of the Academic Senate. **Any Division wishing to assume responsibility for the disqualification of graduate students must submit a request for a variance to Senate."**

47:    In 2005, after 13 years, Zochlinski was given a due process hearing before the UC Davis Representative Assembly of the Academic Senate. The faculty voted to reinstate Zochlinski 46-4. Jeffrey Gibeling, aided by the slanders spread by Jones and Oakley, had prevented any action favorable to Zochlinski, including any hearing, from occurring sooner, from at least 1997 and on through the time Prof. Rodman sought a hearing – 2000-2005. In 2004, unable to prevent a hearing from occurring in 2005, Gibeling sought to undermine it by having a faculty proxy present a question to UCR&J: Who controls disqualification of a student – the Dean or the Senate? This wording was used as Zochlinski's original petition requested the Senate <u>overturn</u> his disqualification. As Gibeling presented this question to the Council, Professor of Law Daniel Simmons, then Chair of the Senate, had Zochlinski change his petition to request <u>reinstatement</u> – an important technicality to avoid Gibeling's argument as admissions were strictly a faculty prerogative under Regents Standing Orders and UC system Bylaws.

48.     After Zochlinski's success in the Representative Assembly, a campaign was launched by Gibeling to prevent Zochlinski's reinstatement. Oakley was the main participant in this effort as he had become chair of the Senate after Prof. Simmons and, soon thereafter, Oakley assumed chairmanship of the Academic Council, which occurred after the unprecedented ouster Council chair Prof. Brunk. Prof. Brunk, as Chair, had expressed interest in Zochlinski's case and sympathy for him. An ouster of a chair had never occurred previously in the history of the UC system and Prof. Brunk has stated in personal communications that his ouster was due, in part, for his refusal to engage in retaliation against Zochlinski.

49.     Oakley, as Council chair, pushed through UCR&J's 6.06 (*supra*). Zochlinski is informed and does believe that this was accomplished through coercion, fraud and oppression on the part of Oakley, including his repeating of the slanders stated *supra*. Such action was undertaken on his part as 6.06 had been brought up for a vote before the entire Council several times under Prof. Brunk's chairmanship, and been rejected each time, returned to UCR&J with demands for clarification and changes. After Oakley took over from Prof. Brunk, 6.06 was again brought to the Council for a vote, without any of the changes previously demanded and without any responses to Council members' questions.

50.     Though 6.06 did not deal in any manner with the question of reinstatement, Gibeling interpreted it as supporting his view that Zochlinski could not be reinstated without his approval. As a member of the administration, Gibeling did not have authority, under UC Bylaws, to make such an interpretation – interpretation is under the authority of the UC Davis Academic Senate Committee on Elections, Rules and Jurisdiction (CER&J), However, Oakley was Chair of the both the Senate and the Council, and permitted Gibeling to decide the issue without objection from the Senate. Gibeling used 6.06, without justification or jurisdiction, to deny Zochlinski reinstatement to the graduate school at UC Davis.

51.     Oakley's actions violate Zochlinski's First Amendment Rights. The slanders he promulgated constitute slander+/stigmatization + as they delayed the original 2005 hearing for several years, then were used to enable passage of 6.06,  and, finally, he allowed 6.06 to prevent Zochlinski from attending UC Davis, despite the faculty's prior vote. Oakley violation of Zochlinski's First Amendment rights

included denying him Equal treatment and Due Process - not insisting CER&J interpret UCR&J's ruling 6.06 and spreading his slanders to intimidate faculty members from supporting Zochlinski.

52.    Oakley's slanders are based on racial animus [anti-Semitism], personal bias and retaliation for past complaints of anti-Semitism against his employer, the Regents of University of California; by enforcing the Regents' policy of retaliation, Oakley expects to be rewarded by the Regents, Zochlinski is informed and believes that he expects the Chancellorship of a UC campus in the future.

53.    Furthermore, Zochlinski is informed and does believe Oakley also acted through fraud and oppression to prevent him from having a hearing before the Academic Council, something he had requested, engaging in slander and stigmatization of Plaintiff to undermine and prevent a hearing.

54.    Due to the stigma of his disqualification, and the associated slanders and rumors, Zochlinski has not been able to find employment in his chosen profession, nor has he been reinstated at UCD or admitted to another university; interfering with his liberty and property interests. Zochlinski has even been excluded from professional meeting and events on the UC Davis campus, and from visiting professors friendly to him, due to the fear that Oakley's slanders have promulgated. This constitutes interference of his rights to free association.

55.    Oakley, in slandering Zochlinski, acted willfully and knowingly, with malice and with reckless and callous disregard for Zochlinski's civil rights as protected both by federal and state laws, through fraud and / or oppression. His statements were false and designed to harm and damage Zochlinski, to prevent his completing his education and to deny him employment in his profession and interfere with his career and his rights to free association; his false words serving to stigmatize Zochlinski beyond the bounds of reason, causing him to be shunned in his community and profession.

56.    Furthermore, they constitute a violation of his rights to a fair trial / hearing and due process, as Oakley was seeking to undermine any and all support for Plaintiff within his community and deny him aid in securing legal representation and deny him the opportunity to equal treatment in his efforts to seek redress of grievances within the UC system and in his civil trials in state and federal courts.

57.    In conclusion, all Oakley's actions were violations of Zochlinski's First Amendment Rights. Oakley's words were not mere slander, but are slander+/stigmatization+, constituting violations of

Zochlinski's rights as guaranteed under the Constitution and protected by both State and Federal Civil Rights laws (*Herb Hallman Chevrolet, Inc. v. Nash-Holmes*, 169 F.3d 636, 645-646 (9th Cir. 1999) as:

    a.  The injury to reputation was inflicted in connection with a federally protected right:

> Zochlinski's efforts at redress of grievances and due process within the UC system (considered the fourth branch of government in the State of California under the law); his efforts at reinstatement within the UC system (admissions to a University); his efforts to secure aid and support in seeking employment in his chosen profession (molecular biologist), etc, were all undermined by Oakley's efforts which were done, in part, in retaliation for Zochlinski's prior complaints of racial bias and his whistleblowing as to Jones' instigation of rape. In doing so, he denied Zochlinski equal treatment / protection.

    b.  The injury to reputation caused denial of a federally protected right:

> Zochlinski was denied reinstatement; denied a hearing before the Academic Council, subjected to unequal treatment (e.g. Gibeling interpreting 6.06 though not having legal authority to do so); denied employment in his field; denied admission to another university; and even prevented him from associating with others in his field who could aid him in securing employment or, at the very least, keep him up-to-date with advances in his field.

58.    The Court should consider that there is an interesting impasse that Oakley faces: *In arguendo*, if Oakley insists that he had met with Zochlinski and came to his false, insulting and absurd conclusions legitimately, then he violated Zochlinski's right to privacy by discussing them outside his office, which is also grounds for suit under § 1983.

59.    John Oakley is sued in his individual and official capacity.

**ACTIONS BY DEFENDANT JONES IN VIOLATION OF ZOCHLINSKI'S CIVIL RIGHTS**

60.    Defendant Jones, acting as described above, interfered with Zochlinski's First Amendment rights as the Supreme Court has declared that Academic Freedom is a "special concern" of the First Amendment. The Court specified university admissions, particularly to a graduate or professional school, as one of the most important aspects of this "special concern" and right under the First Amendment. By preventing publication of the article on Plaintiff in the UC Davis campus paper

1   through intimidation of the editor, Jones denied Plaintiff the opportunity to be heard in a public forum

2   within the community where the publication of information on Plaintiff would be most beneficial to his

3   interests, i.e. readmission to the University of California and clearing his name within the community.

4   61.     Jones, by acting to prevent the publication of a newspaper article through fraud, oppression and

5   implied threat, violated Plaintiff's First Amendment rights, independent of Academic Freedom

6   implications of interfering with his efforts at due process before the Senate. Jones actions, in preventing

7   publication in a local newspaper, of a scheduled and written article on Zochlinski's situation vis-à-vis

8   Jones employer, constitutes a violation of freedom of the Press as well. His continued slander – the

9   false claims that Zochlinski is dangerous and had been convicted in 1972 – also interfered with

10  Zochlinski's efforts at reinstatement and securing employment, thus constituting slander+ /

11  stigmatization+, knowingly and deliberately intended, with malice, to interfere with the liberty and

12  property rights of Zochlinski.

13  62.     Jones actions are based on racial animus [anti-Semitism], personal bias and retaliation for past

14  complaints of anti-Semitism against both him, personally, and his employer, the Regents of University

15  of California.  Jones has had a long-standing vendetta against Plaintiff since 1972 and has repeatedly

16  called him "Jewboy", a racial slur, among other epithets. Jones also acted to prevent Zochlinski

17  securing the social and political standing that comes with career success as a Ph.D., fearing Zochlinski

18  would reveal to the public Jones participation in the gang rape of Zochlinski in 1972, as, after the 1992

19  arrest, Zochlinski had told the Dean that he would reveal Jones 1972 actions at trial. Zochlinski is

20  informed and does believe that he was disqualified (denied his Ph.D.), after which the criminal charges

21  were dropped, because the charges were false and, after Jones racist actions in regards to the attack on

22  the Asian student in 1987, another charge of racism would be damaging to the reputation of UC Davis.

23  Of note, Jones, in a declaration under oath submitted by opposing counsel in another case, did not deny

24  his use of racial epithets when arresting Zochlinski.

25  63.     Jones, in slandering Plaintiff and interfering with his rights, acted willfully and knowingly, with

26  malice and with reckless and callous disregard for Zochlinski's civil rights as protected both by federal

27  and state laws, acting through fraud and oppression. His statements were false and designed to harm

15

and damage Plaintiff, to prevent his completing his education and to deny him employment in his profession and interfere with his career; his false words serving to stigmatize Zochlinski beyond the bounds of reason and causing him to be shunned in his community and profession.

64.     In conclusion, Jones actions were not mere slander, but are slander+/stigmatization+, constituting violations of Zochlinski's rights as guaranteed under the Constitution and protected by both State and Federal Civil Rights laws (*Herb Hallman Chevrolet, Inc. v. Nash-Holmes*, 169 F.3d 636, 645-646 (9th Cir. 1999) as:

    a.   The injury to reputation was inflicted in connection with a federally protected right: Zochlinski right to access to the press (Freedom of the Press) without interference by an agent of the State preventing publication of the story. Jones actions delayed Zochlinski's hearing before the Senate, and served as part of the rumor campaign that engendered fear among faculty in the aftermath of his success at the hearing so that they did not act to confront Dean Gibeling in his usurpation of their authority, thus denying him equal protection / treatment and due process under the law.

    b.   The injury to reputation caused denial of a federally protected right: Zochlinski was denied reinstatement; denied a hearing before the Academic Council, subjected to unequal treatment / protection; denied employment in his field; denied admission to another university. The fear engendered by his actions, as a law enforcement officer spreading false stories of Zochlinski being dangerous and a convicted criminal as of 1972, has had lingering effects even to this day in regards to his treatment by UC officials, faculty and police as well as City of Davis authorities and police. Jones actions / statements further, constitute a violation of Plaintiff's First Amendment rights to a fair trial, as Jones was seeking to undermine any and all support for Plaintiff within the community in his civil suits against the University.

65.     John W. Jones is sued in his individual and official capacity.

**ACTIONS BY DOE DEFENDANTS, INCLUDING MEMBERS OF THE BOARD OF REGENTS OF THE UNIVERSITY OF CALIFORNIA, IN VIOLATION OF ZOCHLINSKI'S CIVIL RIGHTS**

16

66.     The Regents have maintained a "custom, practice and policy" of retaliation against any and all individuals who charge them with civil rights violations and / or racism and / or file suits over such issues. Zochlinski believes, particularly in light of recent revelations regarding the deliberate mishandling of rape allegations on the UC campuses, that the Regents should be included as Defendants in their individual capacity under an extension of the *Monell* doctrine and the RICOH Act.

67.     Zochlinski had informed the Regents, through past suits, pleas by concerned or interested faculty, media articles, and direct communications – letters, emails and telephone calls – of his situation: his conflicts with the UC Davis administration and, particularly and specifically, various actions by Jones and other employees regarding himself and friends of his, particularly women he knew whose reports of crimes were ignored by UC police. The Regents have refused to act to prevent further violations of Plaintiff's civil rights. By both their policy/custom/practice of retaliation and their personal inaction, they have encouraged and supported further violations of Plaintiff's civil rights and made the UC Davis campus unsafe for female students.

68.     Doe defendants are believed to have spread the slanders made by Jones and Oakley, and invent and propagate slanders of their own creation to enforce the Regents custom, practice and policy of retaliation and advance their own careers within the UC system, in violation of law.

69.     However, the District Court has instructed Zochlinski not to include the Regents as Defendants in their individual capacities, so, with due deference, he cannot, at this time, include them. However, with due respect to the Court, he objects to this restriction, and during discovery, should any communications come to light between defendants Oakley and Jones and any Doe, including a Regent of the University of California, indicating complicity in violations of Zochlinski's rights, including but not limited to knowledge of the slanders *per se,* with due respect to the Court, Zochlinski hereby reserves the right to add them as defendants at that time.

### A NOTE ON CALIFORNIA STATE CIVIL RIGHTS LAWS:

70.     As the laws of the State of California for the protection of Civil Rights are based on the Federal laws, Defendants have clearly violated these statutes as well. As the coverage of civil rights under California Civil Code §§ 51-55 (referred to under the names: Unruh, Banes and Ralph) is

17

1   greater than that available under Federal law, and there is no 11th Amendment immunity, Zochlinski

2   files suit for damages under these statutes as well as the Federal Civil Rights statutes.

3   71.   The acts / statements of all Defendants, as alleged above, were deliberate, knowing, willful,

4   wanton, fraudulent, malicious and oppressive, and justify the awarding of exemplary and punitive

5   damages for violations of state law as they are under federal law.

6               **CONSPIRACY UNDER §§ 1981 & 1983, & CLAIMS UNDER §§ 42 USC 2000 et seq.**

7   72.   The Appellate Court upheld the dismissal of Zochlinski's claims under §2000 et seq and his

8   conspiracy claims. With due respect to the Court, Zochlinski cannot and will not re-assert them at this

9   time. However, again with due respect, should evidence be found during discovery of violations of

10  these statutes, particularly evidence of conspiracy – a meeting of the minds to engage in coordinated

11  practices to harm Zochlinski and his interests – he respectfully reserves the right to re-assert these

12  claims at that time. In respect to the issue of conspiracy, a matter often laughed off by the Courts as a

13  sign of paranoia, Zochlinski wishes to point out that, first, as he never met with nor communicated with

14  Oakley before 2005, some party had to inform him of Zochlinski's relations to the UC Davis

15  administration and the Regents before his conversation with Prof. Rodman in 2000. Second, not only

16  did the Regents refuse to intervene to prevent defendant Jones and Oakley's slanders, they had counsel

17  approach the Sacramento News and Review in an effort to prevent publication of the article on

18  Zochlinski in that newspaper after Jones had prevented publication in the UC Davis campus paper.

19                                    **DEMAND FOR JURY TRIAL**

20  73.   As is his right, Plaintiff demands trial by jury.

21                                         **CONCLUSION**

22  74.   The actions of Oakley, Jones and Doe defendants have been part of an ongoing campaign to

23  harm, damage and undermine Plaintiff Howard A. Zochlinski; and to stigmatize him to prevent his

24  employment, continuing education and cause him to be shunned and denied all manner of social

25  intercourse and relations.

26  75.   Zochlinski did not know of the actions of Oakley until he read the Declaration of Prof. Peter

27  Rodman, upon receipt of the document on January 24, 2009. Until did he also did not know of what

means were employed by Oakley in securing passage of 6.06 by the Council nor other aspects of his interference with Zochlinski's rights of due process and equal treatment before the Senate and Council, both considered governmental agencies in the State of California.

76.     While Zochlinski did know of Jones action in preventing the publication of an article on his case against the University of California in the campus newspaper, he did not know of the slanders by Jones, and his statements that Zochlinski is "dangerous" to the press, until he read the Declaration of Prof. Peter Rodman January 24, 2009.

77.     The actions of Defendants have caused Zochlinski to be subjected to racially biased, unequal treatment/protection, denial of due process, interference with liberty and property rights in terms of, among other matters, award of his earned Ph.D., reinstatement to UC Davis or admission to another university. Defendants slanders constitute slander+/stigmatization+ in violation of Zochlinski's Constitutionally protected rights, including, but not limited to, his ability to return to the UC Davis as a student or attend to another university, his ability to secure employment in his profession, his making friends and acquaintances in the city of Davis, within his own (Jewish) community and among his professional peers. As Defendants actions have caused continuing harm, only suit can bring this matter to an end and allow Zochlinski to resume a normal, unhindered, existence.

**WHEREFORE Plaintiff prays judgment as follows:**

77.     For general and compensatory damages in an amount to be determined according to proof at trial, but not less than five million dollars;

78.     For medical and related expenses, including future expenses and proposed medical / surgical procedures, in an amount to be determined according to proof at trial;

79.     For lost earnings, past and future, in an amount to be determined according to proof at trial, but not less than five million dollars;

80.     For exemplary & punitive damages, the amount to be determined later, but not less than $10 million;

81.     For costs incurred herein;

19

82.   For such other and further relief as the Court may deem proper, including equitable and injunctive relief;

83.   Plaintiff is currently uncertain as to specific amounts for damages, including exemplary and punitive; and will seek leave to amend this Complaint to state specific amounts once these are better ascertained.

Signed under penalty of perjury, under the laws of the state of California. Dated: 06/ _17_ /15

SIGNED UNDER PENALTY OF PERJURY:

                              HOWARD ALAN ZOCHLINSKI
                              Plaintiff, In Pro Per
                              101 Luz Pl.,   Davis, CA, 95616,     Tel: 530-758-1474

VERIFICATION [CCP SECTIONS 446, 2015.5]

I, HOWARD ALAN ZOCHLINSKI, am the Plaintiff in this COMPLAINT. I have written and read the foregoing COMPLAINT and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein stated on information and belief, and, as to those matters, I believe it to be true.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June _17_, 2015, at Davis, California.

                              HOWARD ALAN ZOCHLINSKI, IN PRO PER
                              101 Luz Pl., Davis, CA, 95616; Tel: 530-758-1474

1　HOWARD ALAN ZOCHLINSKI
2　101 Luz Pl.
3　Davis, California, 95616
4　Tel: 530-758-1474
5　IN PRO PER

6

7　　　SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF YOLO

8

HOWARD ALAN ZOCHLINSKI, ET. AL.;　　)Case No.: PT-07-009
　　　　　　　　　　　　　　　　　　)
　　　　vs.　　　　　　　　　　　　　)DECLARATION OF PETER RODMAN, Ph.D.
　　　　　　　　　　　　　　　　　　)IN SUPPORT OF PETITIONERS' WRITS
THE REGENTS OF THE UNIVERSITY OF　　)
　　　　　　　　　　　　　　　　　　)
CALIFORNIA, ET. AL.　　　　　　　　)
　　　　　　　　　　　　　　　　　　)Date:　　　　January 22, 2009
　　　　　　　　　　　　　　　　　　)Time:　　　　8:30 a.m.
　　　　　　　　　　　　　　　　　　)Department:　15

9　I, PETER RODMAN, Ph.D., declare as follows:

10　1.　I am Professor Emeritus of the University of California, Davis [UCD].

11　2.　I was employed by UCD for 33 years and 9 months, less one quarter when I was supported by
12　grant funds.

13　3.　During my time at UCD I served in the following positions:

14　a.　Acting Assistant Professor, Assistant Professor, Associate Professor, and Professor of
15　Anthropology from July 1, 1972 to March 31, 2006.

16　b.　Associate Dean of Graduate Studies from January 1, 1985, to December 31, 1986.

17　4.　I met Petitioner Zochlinski in 1985 when he arrived at UCD as a new graduate student in
18　Genetics. He came to request assistance from me because I was Associate Dean of Student Affairs in
19　the Division of Graduate Studies. After this I occasionally saw Mr. Zochlinski on campus until he

came to me in May, 2000, to explain the difficulties he had encountered at UCD since 1985 and to ask for advice. From 2000 to 2006, I met with Mr. Zochlinski often in my office in the Department of Anthropology to discuss his troubled relationship with UCD. This was an informal acquaintance, during which I advised Mr. Zochlinski and discussed his case and came to know him reasonably well. As a result of my knowledge of him and his intellectual capability and of my informal and independent investigations into the background to his disqualification and its aftermath, I have chosen to support his efforts to be treated with fairness by the administration and the faculty of UCD and to seek recourse for past unfairness in my institution. As a result of my efforts on his behalf, which began in the spring of 2000, I am familiar with his case and the actions taken by University officials and employees that have denied Mr. Zochlinski the opportunity to complete his Ph.D. at UCD and that have severely limited his ability to obtain employment in his specialty. I will address issues pertinent to his case in the following paragraphs.

5.      As stated on p.2 of Respondents' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEMURRER TO PETITION FOR WRITE OF MANDAMUS & PROHIBITION [MEMO] and referenced to p 29 of Exhibit 1 of the Third Request for Judicial Notice [TRJN], Mr. Zochlinski was placed on academic probation in 1986. As stated on p 29 of the TRJN, as Associate Dean for Student Affairs, I wrote to Mr. Zochlinski informing him of his probationary status. What the document does not state is that, as a result of his being placed on probationary status, he and I had a meeting at which he explained the medical problems he was facing and other personal issues, particularly the illness of his father. His explanations for his failings were acceptable. Soon after, his grades improved.

6.      When I met Mr. Zochlinski, he was not enrolled as a graduate student and instead was on leave under the Planned Educational Leave Program [PELP], which exists to allow students to break registration for good cause but to not loose their place in a program. Good reasons for educational leave include illness, financial hardship, family difficulties, and so on. Mr. Zochlinski was on PELP because of financial hardship. He had been offered a fellowship by the Graduate Program in Genetics, but when he arrived in Davis, he found that the fellowship had been given to another student because the program had not received Mr. Zochlinski's letter of intent to register.

Declaration of Peter Rodman - 2008                    2

1   Consequently, Mr. Zochlinski had no other means of financial support after moving from New York
2   to Davis in the fall of 1984.

3   7.   Planned Educational Leave is an official "time out" from a degree program. During the period
4   of PELP, the clock stops on progress to a degree. Because of this, no time on PELP should be
5   included in calculating a student's time to degree. Unduly long time to degree was a significant part
6   of the reason that Mr. Zochlinski was said to have made "Unsatisfactory Progress" in the latter part of
7   his time as a graduate student in genetics. If his time on PELP had been treated properly as a time
8   out, his time to degree would not have been unduly long. Formally, he had passed his doctoral
9   qualifying exam after about 8 quarters, or less than three years, which is certainly within normal
10  ranges for doctoral students.

11  8.   The student must agree not to use any university facilities during PELP, but this does not
12  preclude independent work that might be preparation for a degree. For example, in my experience as
13  a director of graduate students in Anthropology, Ecology, and Animal Behavior, students were
14  permitted leave under the PELP while away from campus to do field research for a dissertation. This
15  allowed them to break registration without the need to apply for readmission upon their return. It is
16  my understanding that during a second period of PELP around the time of Mr. Zochlinski's father's
17  death, Mr. Zochlinski prepared for his Qualifying Exam for the Ph. D.

18  9.   As stated on p 2 of the MEMO and referenced in the TRJN, Ex. 1 [Professor Horwitz's letter,
19  p4 and, again, on p29], Mr. Zochlinski had received an unsatisfactory progress report for 1988-1989
20  because he had failed to form a thesis committee. Based on my many meetings with Mr. Zochlinski
21  from 2000 to 2006, I understand the following: In 1987 Mr. Zochlinski's father was becoming
22  increasingly ill, and Mr. Zochlinski's mother was not capable of caring for his father or dealing with
23  his father's medical needs. Mr. Zochlinski was granted permission to go on PELP [Planned
24  Emergency Leave Program] so that he could care for his father in New York. He was approved for
25  PELP and left in 1987. During this time, his father died, and Mr. Zochlinski remained in New York
26  to support his mother for some time afterward. He returned to California in 1988. I have reviewed
27  what records were accessible to me to confirm this account.

10.    In October 1988, Mr. Zochlinski passed his Qualifying Exam for the Ph. D. He did so with high praise from his exam committee members, especially from the chair of the examining committee, Professor John Gillespie. Professor Gillespie has retired and now lives in Maryland and so is not available to repeat his praise in support of Mr. Zochlinski. Sometime after 2000, however, I wrote to Professor Gillespie to ask whether he would join other faculty members in support of Mr. Zochlinski's various petitions to the Graduate Council and the Academic Senate. He wrote back to me by email with words similar to these: *Howard's exam was the best exam I had sat on to that time [Fall 1988], and I will be pleased to support him academically at any time.* I do not have the email now, so this is a paraphrase of the note. I was very impressed with Professor Gillespie's comments, which he repeated in a telephone conversation, because I knew him to be a highly demanding as well as eminent faculty member in a genetics program that was among the best in the world. Clearly, in 1988, Mr. Zochlinski had demonstrated his superior knowledge of his field of genetics.

11.    Due to Mr. Zochlinski's absence from campus during his second PELP, the laboratory he had been associated with could not re-start his projects, and he lost that position. He then had to find a new mentor and a new laboratory and start over from the beginning on a new project. This accounts for the delay he suffered in forming a thesis committee in 1988-1989, as referred to in the document. In my opinion, the delay was reasonable, and the delay had been approved officially by permission to take planned educational leave for good cause. It is also reasonable that the lab had moved on during Mr. Zochlinski's PELP, although perhaps, if I had been Associate Dean at the time and Mr. Zochlinski [or any other student] had asked for my help, I would have interceded to try to work out a continuing relationship of Mr. Zochlinski and that lab in the spirit of the reasons for PELP generally and Mr. Zochlinski's leave in particular.

12.    The relationship between the two DIFFERENT leaves approved for Mr. Mr. Zochlinski is incorrectly stated on p. 29 of the TRJN, where a memo reads, "Thereafter, his PELP was extended due to an illness in his family." There were two different leaves, each one approved by the Graduate Division and the genetics graduate program. Mr. Zochlinski was on PELP from the time of his arrival on the campus in fall of 1984 until spring quarter 1985. As stated this was due to financial difficulty resulting from an administrative error. In 1985 when I met Mr. Zochlinski [after the first PELP was

1   approved I assume by my predecessor, Associate Dean Jameson], I understood that the error was, in

2   part, due to an error on the part of administrators in Graduate Division. I believe Mr. Zochlinski had

3   returned his Letter of Intent to Register, but that his intent had not been communicated to the

4   Graduate Program. Consequently the Genetics program assumed he would not register and therefore

5   would not accept the fellowship he had been offered. The fellowship was given to another student;

6   the mentor whose lab he was due to work with took in another student in Mr. Zochlinski's place. It is

7   not correct to refer to the second PELP as an extension of the first. They were separate leaves,

8   granted for different reasons, both approved appropriately by the faculty and the administration.

9   13.    The points raised in ¶¶ 7 to 12 elucidate a tangled aspect of this matter. The 'normative time

10   to degree' for a graduate student in Mr. Zochlinski's field is, generally, 6 years. On p 29 of the TRJN

11   it is stated that Dean Curry had indicated that normative time to degree in genetics was 5 years. If so,

12   Dean Curry was mistaken. In a Declaration made under penalty in a related case, which Mr.

13   Zochlinski was kind enough to show me, Professor Gibeling stated that the normative time to degree

14   in Mr. Zochlinski's field is 6.3 years. It appears that when evaluating Mr. Zochlinski's progress, the

15   Graduate Division [that is, Associate Dean Curry] treated his time as a student as being from Fall,

16   1984 to December 1992 – eight years and one quarter. As explained above, time spent on PELP

17   should be subtracted from total time to determine time to degree. University officials have

18   consistently not discounted his time on PELP in their calculations and in their presentations to others.

19   Other faculty and individuals making inquiries as to this point have been misled in considering Mr.

20   Zochlinski's time to degree by this improper method of calculation.

21   14.    As stated above, Mr. Zochlinski approached me to enlist my aid in spring, 2000. When I first

22   heard his story, I found it extremely disturbing and possibly incredible, particularly because of the

23   history of Mr. Zochlinski's involvement with a University police officer, Mr. Jones, whose

24   declaration is included as part of a related case. According to Mr. Zochlinski, this officer had been

25   employed at UC Santa Barbara when Mr. Zochlinski enrolled there as a freshman in 1972. According

26   to Mr. Zochlinski, the officer took note of him because he was prominently involved in anti-war

27   protests and therefore had conflicts with police in Santa Barbara. According to Mr. Zochlinski, this

28   officer had not only threatened him, but had pursued charges against Mr. Zochlinski for various

1    alleged crimes. Again, according to Mr. Zochlinski, the same police officer was employed at UCD by

2    1992 and arrested him on a charge of stalking in 1992.

3    15.    I have read Mr. Jones' declaration which disturbs me for the following reason: I have read the

4    request for a warrant that led to the arrest of Mr. Zochlinski in November, 1992, and attached to it

5    were copies of Mr. Zochlinski's 1972 arrest reports from the UCSBPD. I can only imagine they were

6    attached to this request because they strengthened the case for the warrant in an otherwise flimsy

7    case. It is difficult to imagine how these were connected to Mr. Zochlinski in 1993 twenty years later

8    unless someone was familiar with those reports and recognized Mr. Zochlinski's name. It is also

9    disturbing that the arrest reports were presented in spite of the fact that according to Mr. Zochlinski,

10    in each case, the charges were dismissed before trial or were thrown out of court.

11    16.    With regard to the first charge against Mr. Zochlinski in Davis, I aimed to learn more about

12    the case and to assess Mr. Zochlinski's credibility by talking with his attorney, a Public Defender. He

13    told me in so many words that everything Mr. Zochlinski told him about his record checked out as

14    correct—for example, that charges brought in 1972 were dismissed or thrown out of court.

15    17.    This history is relevant to academic affairs with which I am concerned because the arrest

16    occurred at a critical juncture in Mr. Zochlinski's doctoral work, just as he neared the deadline to

17    submit a draft of his doctoral dissertation.

18    18.    Mr. Zochlinski's case had gone to the office of Student Judicial Affairs, and I had known the

19    director there, Ms. Jeanne Wilson, for a number of years because of interactions over possible student

20    violations of the UCD honor code in my classes. Our relationship was cordial, and I have always had

21    great respect for Ms. Wilson's considered and fair treatment of students. Because her name came up

22    in Mr. Zochlinski's remarkable and disturbing story, I went to see her in her office to check on some

23    details that she could confirm. She confirmed that Officer Jones who had submitted the report leading

24    to a charge of stalking against Mr. Zochlinski had moved to UCD from UCSB.

25    19.    I also discussed Mr. Zochlinski's demeanor with Ms. Wilson. She noted that she felt he was

26    dangerous and referred to the fact that he lived near her in Davis and had once spoken sharply to one

1   of her children in the street. I asked her if she knew of any real event that indicated that Mr.

2   Zochlinski was in fact dangerous, and she responded that she did not. I believe we agreed that Mr.

3   Zochlinski's demeanor makes him seem threatening to people; he is blunt and outspoken in what I

4   understand to be typical of some subcultures of New York City.

5   20.   The evening after meeting Mr. Zochlinski, I called my acquaintance, Mr. John Oakley, who is

6   a faculty member in the Law School at UCD and whom I first met in 1971 in Cambridge,

7   Massachusetts. I wanted his advice because I knew he had been defending a convicted criminal on

8   "death row" at the Vacaville State Prison, and I thought he would have a good sense for the merits of

9   standing up for a man who is possibly falsely accused. I also felt he would have some sense of the

10  credibility of Mr. Zochlinski's alleged history and could advise me on whether to pursue supporting

11  him or not. When I gave him Mr. Zochlinski's name, without even discussing the case, Mr. Oakley

12  told me that Mr. Zochlinski had come to his office many years before to ask for his advice and

13  assistance in his case against the University. He continued to advise me not to become involved with

14  Mr. Zochlinski. In his words, I could be "...putting myself and my family in danger..." by doing so.

15  He went on to equate his impression of Mr. Zochlinski with his impression of Charles Manson, the

16  convicted psychopath housed at the Vacaville prison where his death row client is housed.

17  21.   I have no doubt Mr. Oakley was sincerely concerned for my safety and thought he was giving

18  me a reasonable admonition. His was the most extreme version of this reaction to Mr. Zochlinski, and

19  he was the most extremely wrong in his description. It is chilling to think that first impressions that

20  are so wrong and so irrational like those of Ms. Wilson and Professor Oakley could have affected Mr.

21  Zochlinski's life so consistently.

22  22.   Since 2000, from my interactions with the administration and fellow faculty on behalf of Mr.

23  Zochlinski, I have become privy to various actions taken against him by the University.

24  23.   One of the first actions I became aware of was that holds had been placed on Mr. Zochlinski's

25  degrees and transcripts by both the Office of Student Judicial Affairs and the Dean's Office. These

26  holds would prevent his going to another University to complete his education and would prevent his

27  employment because official copies of prior transcripts are required for admission to any academic

1 │ program and inquiries to substantiate a job candidate's degrees are normal. Because of the holds, Mr.

2 │ Zochlinski unknowingly had never been awarded the MS in genetics that he thought he had earned.

3 │ The Registrar at UCD has said that inquiries from potential employers are only answered in writing,

4 │ but in my experience it is normal practice for an employee in the Office of the Registrar to relay

5 │ simple information by telephone if it is efficient to do so.

6 │ 24.     In late 2000, I met a student journalist named Teresa Lee who was investigating Mr.

7 │ Zochlinski's case to prepare an article on the case. I learned a number of things directly from her,

8 │ including:

9 │ a.     Jeanne Wilson had repeatedly denied that any holds were on Mr. Zochlinski's documents.

10 │ When confronted with a current copy of the conduct hold document by Ms. Lee, in June 2001, Ms.

11 │ Wilson attributed it to "clerical error" and indicated she had the holds removed. Sadly, the holds are

12 │ still there today. A conduct hold was unwarranted in the beginning because Mr. Zochlinski had only

13 │ been <u>charged</u> with stalking. This charge was dismissed by the court before the case came to trial, yet

14 │ the conduct hold has persisted. Mr. Zochlinski, in my opinion, was judged guilty by the UCD Office

15 │ of Judicial Affairs, in consultation with Associate Dean Curry and, I believe, the UCDPD, well

16 │ before the charge against him was considered by the court and dismissed.

17 │ b.     Shortly after that, Ms. Wilson asked the journalist to return for a follow-up interview. Ms. Lee

18 │ told me that upon arriving at Ms. Wilson's office for this follow-up, she was met by both Ms. Wilson

19 │ and Prof. Scott Hawley, former chair of Mr. Zochlinski's Graduate Group [mentioned in the TRJN.

20 │ particularly Ex 1, p30, under Dec. 28, 1992]. According to Ms. Lee, as told to me in a conversation

21 │ following the interview, Prof. Hawley described Mr. Zochlinski, including these assertions:

22 │        i.     Mr. Zochlinski was a Satanist;

23 │        ii.     Mr. Zochlinski, during a meeting with Hawley in March, 1993, had threatened to

24 │ kill Officer Jones, the UCDPD officer whose actions had precipitated this entire chain of events, in a

25 │ satanic ritual.

1          iii.          Mr. Zochlinski was dangerous and unstable.

2    25.    Neither the extreme assertions of Professor Oakley that I heard directly nor the outlandish

3    assertions by Professor Hawley that were reported to me by Ms. Lee were credible. I had come to

4    know Mr. Zochlinski as an Orthodox Jew true to his roots in the Bronx, who had recruited several

5    local rabbis to aid him in his efforts. From long conversations in my office, I knew Mr. Zochlinski to

6    have a good heart, great intelligence, and remarkable good humor behind a potentially disquieting

7    demeanor.

8    26.    The nature and tone of Professor Hawley's involvement in 2001 calls into to question another

9    aspect of this matter. With all due respect I should like to point out to the Court that in the MEMO

10   Respondents state that his Ph.D. committee and Hawley "recommended" his disqualification from the

11   program [MEMO p.2, ll.16-17]. This assertion is repeated in Provost Horwitz's letter [TRJN, Ex 1,

12   p4 ¶3]. Although the graduate program and the committee were not pleased with Mr. Zochlinski's

13   progress, it was Associate Dean Curry who suggested that Mr. Zochlinski be disqualified in his letter

14   of Dec. 28, 1992 [the letter is mentioned in the TRJN Ex 1, p 30]. According to Mr. Zochlinski, he

15   was not informed of this letter, nor was he provided a copy, at that time. A student must be informed

16   of all correspondence about his academic progress, but the letter was stamped 'Confidential.'

17   According to Mr. Zochlinski, he was only given a copy months later by one of the recipients who

18   thought the Associate Dean's actions in writing the letter and distributing it to Mr. Zochlinski's

19   committee were improper and coercive. Although discussions between a Dean and a program director

20   about a student's progress are normal and necessary, such a letter to a graduate advisor and a

21   student's committee members without the student's knowledge is, in my opinion, neither normal nor

22   legitimate. I have attempted to discuss this issue with former Associate Dean Curry, whom I knew

23   reasonably well in the 1980s, but he moved to another university and then retired before I knew of his

24   specific involvement or of this case.

25   27.    Teresa Lee was a journalist for the *California Aggie*, the UCD student newspaper, at the time

26   she was writing about Mr. Zochlinski in 2001. The article on Mr. Zochlinski was to appear in the

27   Aggie. According to Ms. Lee, before the article was to appear, Officer Jones went to see the editor.

1   According to Ms. Lee, the editor was intimidated by Jones's description of Mr. Zochlinski as a

2   dangerous man and decided not to run the story. Again according to Ms. Lee, after a complaint about

3   Officer Jones's actions, the police concluded that he did nothing wrong other than using his own keys

4   to enter the paper's offices instead of making an appointment before hand or knocking and being

5   invited to enter. By Ms. Lee's report, after the Aggie refused to run the story on Mr. Zochlinski, Lee

6   was no longer employed by the paper because the editor refused to accept any articles from her. Her

7   article was eventually printed in *The Sacramento News and Review*.

8   28.     During my involvement in this case, I was told by former Graduate Council Chair Gilchrist

9   that despite Mr. Zochlinski's assertions, he had no prospective supervisor and no dissertation project

10  if he were to be allowed to be readmitted to the genetics program. This was a mistaken assertion,

11  because the Graduate Council had received a memo from Professor Michael Syvanen, I believe in

12  1997, stating that he would take Mr. Zochlinski as a student and that he had a dissertation project

13  suitable for Mr. Zochlinski in the special area of bioinformatics. I have seen a copy of that memo, and

14  Professor Syvanen told me in a telephone conversation that he felt this was a good project for Mr.

15  Zochlinski still in 2000 because the field of bioinformatics was still new and hot, it did not require

16  lab skills [Mr. Zochlinski is said to have been clumsy in the lab despite his academic ability] and did

17  not require the social interaction of a laboratory environment.

18  29.  Sometime in 2001, Mr. Zochlinski was told by Rabbi Kaufman that Associate Dean [of Student

19  Affairs] Rose Kraft had told Rabbi Kaufman that Graduate Dean González's would permit Mr.

20  Zochlinski to apply for and be admitted to a different graduate program if accepted, but not

21  readmitted to the program in genetics. Mr. Zochlinski pursued other programs, but while he waited to

22  hear back from several departments, Associate Dean Kraft informed Mr. Zochlinski and his faculty

23  supporters that he would not be readmitted. Her stated reason this change of news was that Professor

24  Jeffrey Gibeling, then Chair of the Academic Senate, had informed her that disqualified graduate

25  students could not reapply to any graduate program at UCD under a rule implemented by the

26  Academic Senate in 1977.

30.  At the same time, the Graduate Student Advisor's Handbook and printed University regulations stated the following: *Disqualification means that, for one or more of the academic reasons listed below, a student is no longer eligible to continue graduate study in the current program.* ***Disqualification does not preclude the student from submitting an application for admission to another program.*** *A student may be disqualified ONLY by the dean of Graduate Studies and in accord with the procedures outlined below. The term "dismissal" should NOT be confused with "disqualification." Dismissal is removal from graduate studies based on behavior or conduct.]* [my emphasis] According to this rule, Mr. Zochlinski could have applied to any program but genetics and been admitted at any time since his disqualification in 1993. Mr. Zochlinski had attempted to apply several times before, but prior to Dean González's reversal of her stance [via Associate Dean Kraft. via Rabbi Kaufman], the Graduate Division would not accept his applications. The rule stated that he could apply, but the Graduate Division arbitrarily chose not to accept applications from Mr. Zochlinski. If any other disqualified student was allowed to apply to a different department between 1993 and the event described in ¶ 31, *infra*, I must question whether there was any legal rationale for discriminating against Mr. Zochlinski's applications. Reasons were not given.

31.  At approximately this time (July, 2001), the wording on the Graduate Division web page regarding disqualification was changed to read: *Disqualification means that, for one or more of the academic reasons listed below,* ***a student is no longer eligible to continue graduate study at the University of California, Davis.*** *A student may be disqualified ONLY by the Dean of Graduate Studies and in accord with the procedures outlined below. The term "dismissal" should NOT be confused with "disqualification." Dismissal is removal from graduate studies based on behavior or conduct.* [my emphasis].

32.     The change was puzzling and disturbing for several reasons.

a.     At the time in July 2001 there were several other areas in the handbook that referred back to a student's ability to apply for readmission. Those were only changed after the initial wording was modified. Thus, for several weeks, there were inconsistencies in the document.

1    b.    The Graduate Handbook had been mis-printed for 20+ years if the rule had been established in

2    1977. I would probably have been familiar with the rule as Associate Dean in the 1980's, but I was

3    not. In fact, I was very aware of the rule that a student could not be readmitted to the same program

4    <u>but could apply for readmission to another program</u> since such cases came to my desk during my time

5    as Associate Dean.

6    c.    There was no evidence to support Professor Gibeling's claim that such a change in rules had

7    "passed" in 1977. Members of the Academic Senate would have had to approve it, and there is no

8    record of a vote. There is a note in the record of proceedings of the Graduate Council for 1977 that

9    the matter was discussed by the Graduate Council in 1977, but apparently no vote was taken.

10    33.    The policy stated in ¶31 has been changed. Today the Graduate Studies policy document

11    regarding disqualification and appeal reads: *If disqualified from a graduate program, a student is no*

12    *longer eligible to work toward her/his current degree objective in that program, **but is eligible to***

13    ***apply for a lesser graduate degree, in the case of a doctoral student, in that program or <u>for any</u>***

14    ***<u>graduate degree in another UC Davis graduate program</u>.*** *Admissibility to another program is to be*

15    *determined by the usual program procedures and must include consideration of the factors*

16    *pertaining to the earlier disqualification.*

17    34.    I am particularly aware of the change because of a separate series of events not connected to

18    Mr. Zochlinski. I was the graduate adviser for students in biological anthropology in 2005-2006, both

19    before and after the the wording in ¶31 above was printed. In the spring of 2006, a student in

20    anthropology named Janet Franklin had just been notified by me of her disqualification from our

21    graduate program. She met with me and asked if she could reapply, and, based on my knowledge of

22    Mr. Zochlinski's history, I told her that the Graduate Division would not allow her to reapply to

23    Anthropology. I felt certain of this because of my familiarity with the Graduate Dean's refusal to

24    accept an application to Genetics from Mr. Zochlinski. Sometime after this, I met Ms. Franklin as we

25    crossed paths outside on campus. Ms. Franklin told me that she was just returning from an

26    appointment with Kathy Jurado, a staff member in the Office of Graduate Studies. She was happy

27    because she had been told that if the department chair wrote in support of her reapplication, she could

1 reapply to the graduate program in Anthropology in spite of the rule. Because of Mr. Zochlinski's

2 experience, I was certain that this could not happen, but the advice sounded exactly the same as

3 advice that would have been given to a student in the 1980s when I was Associate Dean. The basic

4 policy was that the Graduate Division would bend to the Faculty's wishes.

5 35.    I informed Mr. Zochlinski of Ms. Franklin's situation and the advice she had received because

6 it was quite relevant to his relations with Graduate Studies. He told me he would look into it. He

7 returned to my office shortly thereafter and informed me that he had attempted to apply, again, for

8 readmission, as had been suggested to Ms. Franklin. He stated to me that he was refused the

9 opportunity to apply and had then complained to those present of bias, mentioning the case of Ms.

10 Franklin in the process.

11 36.    A few days after this, Ms. Franklin came to tell me that she had been told that she could no

12 longer apply for readmission. She was not given an explanation as to the reason for this change in

13 information.

14 37. From 2000 to 2002 I was in communication with Professor Gibeling on the matter of Mr.

15 Zochlinski's readmission. Attached are true and correct copies of a letter sent to Professor Gibeling

16 on behalf of several faculty members who support Mr. Zochlinski in his efforts to complete his

17 education and of the response to me from Professor Gibeling in March, 2001. Several items in

18 Professor Gibeling's letter merit consideration by the Court:

19 a.    Professor Gibeling's statement [p2, ¶2] that economic considerations were involved in the

20 decision to disqualify Mr. Zochlinski constitutes grounds for appeal of the disqualification, since only

21 academic criteria may contribute to disqualification. As far as I know this cause for appeal has never

22 been considered and has never been admitted to by the administration other than in the letter

23 addressed to me.

24 b.    In the final paragraph Professor Gibeling states that "Zochlinski has exhausted the appeals

25 process with the University of California." This assertion was incorrect because an appeal to the

1   Representative Assembly was still an option at that point and a direct appeal to the Chancellor of the
2   campus would also have been possible.

3   c.      While mentioning the December 28, 1993, memo of Dean Curry, Professor Gibeling glosses
4   over the fact that Dean Curry's memo violated University procedures and rules because Mr.
5   Zochlinski was not informed of the content of the memo. Further, Professor Gibeling states that there
6   is evidence that Mr. Zochlinski was informed of Dean Curry's intentions through conversations and
7   other notes, but my conversations with Mr. Zochlinski make me suspect that this was not the case.
8   Instead, it seems that Mr. Zochlinski believed at the time in question [1992-1993] that Dean Curry
9   was advocating Mr. Zochlinski's case to the Administrative Committee of the Graduate Council, the
10  graduate program, and the dissertation committee. I believe he also had participated in discussions
11  with Student Judicial Affairs and the UCDPD that led to the conduct hold placed on Mr. Zochlinski's
12  transcript.

13  d.      Most telling is Professor Gibeling's discussion of the review by Professor Kiskis. Professor
14  Gibeling asked Professor Kiskis to review the case with no input from Mr. Zochlinski or other
15  faculty. More importantly, I learned from a subsequent telephone conversation with Professor Kiskis
16  that, although he determined that Mr. Zochlinski's disqualification was procedurally correct based on
17  the information he had reviewed, he had recommended to Professor Gibeling that Mr. Zochlinski be
18  readmitted as a student and given a chance to complete his work. Professor Gibeling did not inform
19  me or the other faculty advocating Mr. Zochlinski's case of this fact.

20  38.     In 2003 I became the Chair of the Faculty of the College of Letters and Science and served *ex*
21  *officio* on the Executive Committee of the Representative Assembly of the Academic Senate at UCD.
22  As I reviewed the agendas for Assembly meetings, I noted the standing item, "Student Petitions."
23  Apparently there had never been a student petition submitted to the Assembly, despite the standing
24  agenda item. I encouraged Mr. Zochlinski to submit a petition to have his disqualification from the
25  Graduate Program in Genetics overturned. Petition to the Assembly was appropriate since the
26  Graduate Council, which had reviewed and denied Mr. Zochlinski's appeals in the past through its

1    own Administrative Committee, is a standing committee of the Representative Assembly. The

2    Assembly is the only body that can reconsider decisions made in the Graduate Council.

3    39.    On Monday, January 12, 2004, Professors Gardner, Erickson and I met with Rabbis Shmary

4    Brownstein, Yossi Etz-Hasadeh and Kenneth Kaufman to discuss what could be done to aid Mr.

5    Zochlinski. At this meeting Rabbi Etz-Hasadeh stated that he had been approached by a member of

6    the Jewish community who made an effort to dissuade him from aiding Mr. Zochlinski in any

7    fashion. The Rabbi stated that this individual had made various disparaging remarks about Mr.

8    Zochlinski, had said that Mr. Zochlinski could not be believed or trusted and that any effort to aid

9    him could backfire on the individuals involved. The person who spoke to the rabbi had stated that he

10   was acting on behalf of the Dean of Graduate Studies, which was Jeffrey Gibeling. All of us were

11   surprised by this revelation.

12   40.    On February 12, 2004, Mr. Zochlinski submitted a formal petition to the chair of the

13   Academic Senate for a hearing. It took a year to have the matter placed on the agenda. During that

14   time I met with several committees in my efforts to move the case forward. Though the Graduate

15   Council made a decision against Mr. Zochlinski, the Executive Committee, after a meeting in which I

16   made a presentation on behalf of Mr. Zochlinski, voted to have the matter of his reinstatement put

17   before the entire Representative Assembly.

18   41.    The Representative Assembly of the Davis Division of the Academic Senate of the University

19   of California represents the Faculties of the Schools and Colleges of UCD, and by Standing Orders of

20   the Regents [SOR], these Faculties are in charge of all instruction and academic affairs of the

21   campus, subject to rules of the University-wide Assembly. Graduate studies is explicitly separated by

22   the SORs from the individual schools and colleges and placed under the direction of the Graduate

23   Council—which is still a committee of the Representative Assembly on each campus. The point here

24   is that in law, the university administration has no supervisory role over curricula and academic

25   affairs and is instead charged to implement the academic and curricular programs of the Faculty. It is

26   puzzling and anomalous in the view of many faculty members that the university-wide Academic

27   Senate has adopted Regulation 904, which states that "Disqualification of graduate students is at the

1  discretion of the Dean of the Graduate Division concerned." This is the regulation, nonetheless, but it
2  does not place <u>reinstatement</u> under the Dean's discretion.

3  42.     On February 28, 2005, the Representative Assembly met. As the major part of its agenda, a
4  discussion and vote took place on the issue of Mr. Zochlinski's reinstatement. A recent letter from
5  Provost Barbara Horwitz to Professor Linda Bisson, Chair of the Academic Senate, and submitted to
6  the court purports to describe the events of that meeting. The description, however, is incomplete and
7  inaccurate in ways that diminish the importance and depth of discussion and deliberation by the
8  faculty during that meeting.

9  43.     Representatives were well informed as to the issues before the meeting. In preparation for this
10  meeting the agenda packet, provided to the faculty weeks earlier, included both Mr. Zochlinski's
11  petition and numerous opposition documents provided by the administration and the Graduate
12  Council.

13  44.     It should be noted that, in his original petition, Mr. Zochlinski had requested that his
14  disqualification be overturned. The chair of the Academic Senate, Daniel Simmons, a professor of
15  law at King Law School, had decided that the matter should be presented as a vote for reinstatement,
16  and not as overturning of the disqualification. I believe his rationale was that there could be some
17  legal questions, under University regulations, as to whether the faculty had the authority to overturn a
18  disqualification. On the other hand, issues of admission, readmission and reinstatement have always
19  been a faculty prerogative.

20  45.     The debate on Mr. Zochlinski's reinstatement lasted nearly two hours. Mr. Zochlinski
21  attended the meeting by invitation from Senate Chair Simmons. In contradiction to Professor
22  Horwitz' statement [TRJN, Ex 1, p2-3], Mr. Zochlinski did not make a presentation.

23  46. If I am not mistaken, the discussion began when Professor John Labovitch reported the
24  deliberations of the Special Committee appointed by the Executive Committee of the Representative
25  Assembly. If I am not mistaken, the Special Committee recommended against approving this petition
26  based on the record of proceedings of the Graduate Council and reports of Dean Gibeling.

47.     Following this I made the case for reinstatement before the assembly. This is not mentioned in Professor Horwitz's letter. As part of this presentation, I spent some time refuting and dispelling mis-characterizations and rumors about Mr. Zochlinski that had circulated over the years since his disqualification. I felt this was necessary because of the widespread bias that had built up against Mr. Zochlinski, which I have described in paragraphs above.

48.     Following my presentation, the floor was open for question and comment. In response to a question regarding Mr. Zochlinski's qualifications after so many years out of academia and whether any faculty member would be willing to oversee work by Mr. Zochlinski, Professor Michael Syvanen addressed the assembly, describing his knowledge of Mr. Zochlinski's skills, depth and breadth of knowledge, and his own willingness to oversee Mr. Zochlinski's work. Professor Syvanen also voiced his personal knowledge of Mr. Zochlinski's character and sought to dispel further the rumors that had developed.

49.     In the course of the preceding discussion, it was mentioned that assertions had been made in Graduate Council meetings that Mr. Zochlinski was mentally ill—specifically that he was called a "paranoid schizophrenic" by a former chair of the Council. The point of the assertions was to warn Council members not to engage in discussion with Mr. Zochlinski. In response to this, one former Graduate Council member responded that he did not recall ever hearing these assertions although he was a member of Graduate Council at the time they were supposed to have occurred.

50.     Professor Murray Gardner spoke at some length. Professor Gardner had the most experience with Mr. Zochlinski as he had chaired Mr. Zochlinski's Ph.D. dissertation committee and served as his mentor until his disqualification. Professor Gardner was also a member of Mr. Zochlinski's qualifying exam committee in 1988. Referring to Mr. Zochlinski's arrest in November 1992 on the stalking charge, Professor Gardner stated that he had not been informed at the time of Mr. Zochlinski's disqualification of the full extent of what had happened to Mr. Zochlinski and the effects it had on him. He stated that if he had known of the circumstances, he would have acted to prevent the disqualification at that point. Referring to Mr. Zochlinski as 'brilliant' Professor Gardner asked that he be reinstated with full credit for past accomplishments.

51.    After Professor Gardner's presentation a vote was taken. The faculty voted in favor of reinstatement: 46 in favor, 4 opposed.

52.    These are the facts of the discussion and vote as I recall them. It is troubling that, whether from weak memory or for other reason, Provost Horwitz has so misrepresented the faculty deliberations. Far from "having the floor," and "being free to present his version of the events without rebuttal or questioning," Mr. Zochlinski spoke only twice. I redirected a question I could not answer to him; and a faculty member directed a question to Mr. Zochlinski that Mr. Zochlinski answered after receiving permission from the chair to speak. Far from there being a lack of rebuttal or questioning, the floor was open to all who might care to question the assertions made by me, by Professor Syvanen, or by Professor Gardener.

53.    It is unflattering, if not outright disrespectful, that Provost Horwitz has chosen to ignore or has forgotten that the case was presented by long established members of the faculty to an assembly of representatives of the faculty from all schools and colleges, including former and current members of all the standing committees of the Assembly. She and others, particularly Dean Gibeling, have ignored the many steps and discussions that led to this presentation, and, as far as I know, they have not inquired of any of us just why we would support such a case in spite of the rules and procedures that they allege were followed and multiple colleagues involved in first disqualifying Mr. Zochlinski and second, reviewing and responding to his multiple appeals.

54.    It has been a difficult thing to advocate on behalf of Mr. Zochlinski. When I meet colleagues who may not know the whole story, they are likely to refer to him as my "buddy" as if I have acted doggedly on behalf a little-deserving friend. Mr. Zochlinski is not my "buddy." I have only met with him in my office, and only seen him once since February 2005. I have learned he has a brilliantly analytical mind, and I enjoy his sense of humor that persists in spite of his deep disappointments in life, but I have pursued this case out of principle, not out of friendship.

55.    In spite of the possibility that faculty and administration's actions in this case may be justified and explained by the book of rules, regulations, and procedures, I believe Mr. Zochlinski has been done wrong by my institution. The Graduate Council and Graduate Division have constantly

Declaration of Peter Rodman - 2008          18

1    deployed rules and procedures and a wealth of lawyers against him, and it is this that has led me from

2    principle to continue to support Mr. Zochlinski. When I was a member of the Graduate Council, later

3    as Chair of the Graduate Council, and subsequently as Associate Dean of Graduate Studies, and

4    always as major professor to bright young graduate students, I believed in the principle of defending

5    a student against the vastly larger power of the University, even against the disproportionate power of

6    a single faculty member, when there might be a reason to do so. That was a guiding principle in

7    graduate studies when I was involved and should continue to be.

8    56.    None of us who support Mr. Zochlinski have previously argued that he should be given a Ph.

9    D. under the "three-paper rule". We only have argued that, as Professor Kiskis decided in 2001, he

10   should be reinstated and given another chance to complete the Ph. D. without the terrible threat of a

11   stalking charge over his head. The charge was dismissed, a fact which probably reflects, at least in

12   part, a questionable case based on the report of a police officer who had a bone to pick with Mr.

13   Zochlinski. The university's actions at the time, however, have left this man in sad limbo for 16

14   years.

15   57.    After all the years of examining the case, it is clear to me that those who acted to disqualify Mr.

16   Zochlinski in 1993 acted as if he were a criminal and a danger to our university society, and he was

17   and is neither one. He is a colorful, brilliant, and still optimistic person. He is also a bluntly irritating

18   man to many, but he did not merit the ill-treatment and defamation he has received from members of

19   our community.

20   58.    I do not know and cannot comment on the question as to whether there is anti-Semitic bias in

21   this matter. I do believe there has been bias against Mr. Zochlinski's personality. In this way, Mr.

22   Zochlinski has been his own worst enemy, but only because of the way others have responded to him.

23   This is how the world works, and perhaps Mr. Zochlinski should have learned and adjusted to avoid

24   his difficulties. This does not excuse the bias, however. Unfortunately some of us just cannot make

25   such adjustments, but we do not therefore deserve to be thrown out of the system—especially out of a

26   public system that prides itself on its democratic principles. In my view, this is a primary reason we

1   have to regulate our societal relationships to maintain a just society, by preventing injustice to the

2   least among us whenever possible.

3   59.      As to the issue of the "three-paper rule", if this were 1993 and Mr. Zochlinski's Ph.D. were

4   riding on the acceptance of the "three paper rule" for a dissertation, I would consider support of

5   awarding the degree for these papers only after inquiring more of his mentors – Dr. Gardner and

6   Professor Yamamoto whom he worked with in the laboratory - about his substantive role in

7   producing them. However:

8   Given reasonable doubt that Mr. Zochlinski has been treated fairly by the university;

9   Given the years of dismay incurred as a result of not having a final chance to write his dissertation;

10  and

11  Given the absurd expenditure of resources of the university, of the state, and of the people of

12  California supporting the University's Goliath against Mr. Zochlinski's David, it is more than fair

13  and appropriate to put an end to this conflict, to award him the Ph.D. based on these three papers, and

14  to allow him what chance he has left to make use of it.

15  I make the foregoing statements from personal knowledge except as to those matters stated on

16  information and belief, and if called as a witness in this case, I could testify thereto.

17  I declare under penalty of perjury under the laws of the State of California that the foregoing is true

18  and correct and that this declaration was executed on this 10th day of January, 2009, in Davis, Yolo

19  County, California.

20

21  Peter S Rodman, PhD.

22  Professor Emeritus

23  University of California, Davis

Declaration of Peter Rodman - 2008           20

HOWARD ALAN ZOCHLINSKI
101 Luz Pl.
Davis, California, 95616
Tel: 530-758-1474
IN PRO PER

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

HOWARD    ALAN    ZOCHLINSKI,

Plaintiff / Appellant;

vs.

JOHN OAKLEY, JOHN WARREN
JONES, AND UNKNOWN
INDIVIDUALS. HEREBY
DESIGNATED AS DOES 1-100
DEFENDANTS IN BOTH THEIR

OFFICIAL AND INDIVIDUAL

CAPACITY

No. CV-2:10-cv-01824 JAM-KJM

PROOF OF SERVICE:

AMENDED COMPLAINT FOR: SLANDER &
DEFAMATION    OF    CHARACTER;
INTENTIONAL INFLICTION OF MENTAL
SUFFERING AND EMOTIONAL DISTRESS;
INTERFERENCE    WITH    RIGHT    TO
PRACTICE PROFESSION AND PURSUE
CAREER & EMPLOYMENT THROUGH
STIGMATIZATION; VIOLATION OF THE
RIGHT TO PRIVACY, VIOLATIONS OF THE
FIRST AND 14TH AMENDMENTS TO THE
CONSTITUTION    AND    CIVIL    RIGHTS
VIOLATIONS    UNDER    FEDERAL    AND
STATE LAWS INCLUDING, BUT NOT
LIMITED TO, 42 USC §§ 1981, 1982, 1983,
1985, 1986, 2000a-2000e, AND CALIFORNIA
STATE LAWS OF A SIMILAR NATURE AND
INTENT [CIVIL CODE §§ 51-55], AND
CONSPIRACY TO DO ALL OF THE ABOVE.
PLAINTIFF ASKS FOR EXEMPLARY AND
PUNITIVE DAMAGES.

# PROOF OF SERVICE

I, Leah Frost , declare and state as follows: I am employed/ reside at

1715 Anderson Rd.
Davis, CA 95616

in the City of Davis, California in the County of Yolo. I am over the age of eighteen and not a party to this action.  On June 17, 2015, I served the following document(s):

AMENDED COMPLAINT FOR: SLANDER & DEFAMATION OF CHARACTER; INTENTIONAL INFLICTION OF MENTAL SUFFERING AND EMOTIONAL DISTRESS; INTERFERENCE WITH RIGHT TO PRACTICE PROFESSION AND PURSUE CAREER & EMPLOYMENT THROUGH STIGMATIZATION; VIOLATION OF THE RIGHT TO PRIVACY, VIOLATIONS OF THE FIRST AND 14TH AMENDMENTS TO THE CONSTITUTION AND CIVIL RIGHTS VIOLATIONS UNDER FEDERAL AND STATE LAWS INCLUDING, BUT NOT LIMITED TO, 42 USC §§ 1981, 1982, 1983, 1985, 1986, 2000a-2000e, AND CALIFORNIA STATE LAWS OF A SIMILAR NATURE AND INTENT [CIVIL CODE §§ 51-55], AND CONSPIRACY TO DO ALL OF THE ABOVE. PLAINTIFF ASKS FOR EXEMPLARY AND PUNITIVE DAMAGES.

Service was made on the interested parties in this action by **UNITED STATES MAIL**, by placing a true and correct copy in a sealed envelope addressed as shown below with sufficient postage. I personally placed said envelopes in a postal box in Davis, California. I am aware that, on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after the date of deposit for mailing stated in this affidavit. The addresses were as follows:

Gregory Fox, Esq.
Bertrand, Fox, Elliot, Osman & Wenzel
2749 Hyde St.
San Francisco, CA, 94109
gfox@bfesf.com

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed on June 17, 2015, in the City of Davis, California.

Signed: _____